2016R00491

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| | : Hon. |
| v. | : |
| | : Crim. No. 20- |
| TIMOTHY GIBSON | : |
| | : 18 U.S.C. § 1349 |
| and | : 18 U.S.C. § 1343 |
| | : 18 U.S.C. § 1028A |
| AHARON LEV, | : 18 U.S.C. § 2 |
| a/k/a "Aaron Lev," | : |
| a/k/a "Aron Lev," | : |
| a/k/a "David Gold," | : |
| a/k/a "David Monroe" | : |

# INDICTMENT

The Grand Jury in and for the District of New Jersey, sitting at Newark, charges:

### Count One
### (Conspiracy to Commit Wire Fraud)

### Relevant Persons and Entities

1. At all times relevant to this Indictment:

   a. Defendant AHARON LEV, a/k/a "Aaron Lev," a/k/a "Aron Lev," a/k/a "David Gold," a/k/a "David Monroe" ("LEV") resided in or around New Jersey, New York, and Israel.

   b. Defendant TIMOTHY GIBSON ("GIBSON") resided in or around Utah and operated a business that, among other things, bought frequent flyer miles, which were issued by airlines as rewards to their customers ("Miles"), from consumers and sold those Miles to travel agencies and others.

    c.    The "Credit Card Company" was headquartered in or around New York and offered credit card services to customers, including small businesses and their owners.

    d.    The Credit Card Company offered certain rewards to cardholders, including points awarded to a customer in proportion to that customer's spending on the Credit Card Company's credit cards ("Rewards Points").

    e.    To attract new customers, the Credit Card Company also periodically made promotional offers of additional Rewards Points to any customer who spent a certain amount of money on a newly-issued card within a specified time period ("Promotional Rewards Points").

    f.    Customers could exchange Rewards Points for, among other things, Miles that could be used to purchase airline tickets. When a customer exchanged Rewards Points for Miles with a particular airline, the Credit Card Company compensated that airline for the value of the Miles.

    g.    A small business could apply for a small-business credit card account with the Credit Card Company by submitting an application ("Application") through an authorized representative ("Applicant").

    h.    An Application required, among other things, the Applicant's personally identifiable information ("PII"), including the Applicant's social security number and address; information about the Applicant's position with, and salary from, the small business; and information about the small business itself.

i. In submitting an Application, the Applicant certified that he or she was the small business's authorized representative and that the information provided on the Application was accurate.

### The Conspiracy

2. From at least as early as in or about August 2014 through at least in or about May 2016, in Ocean County, in the District of New Jersey, and elsewhere, defendants

**TIMOTHY GIBSON**

**and**

**AHARON LEV,**
a/k/a "Aaron Lev,"
a/k/a "Aron Lev,"
a/k/a "David Gold,"
a/k/a "David Monroe"

did knowingly and intentionally combine, conspire, confederate, and agree with each other and with others to devise a scheme and artifice to defraud the Credit Card Company, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and, for the purpose of executing and attempting to execute such scheme and artifice to defraud, to transmit and cause to be transmitted by means of wire communications in interstate and foreign commerce certain writings, signs, signals, pictures, and sounds, contrary to Title 18, United States Code, Section 1343.

### The Goal of the Conspiracy

3. It was the goal of the conspiracy for GIBSON and LEV to enrich themselves by (a) opening small-business accounts with the Credit Card

3

Company in the names of third parties and fictitious small businesses (the "Fraudulent Accounts"); (b) using the Fraudulent Accounts to make purchases generating Promotional Rewards Points (the "Points-Generating Purchases"); (c) exchanging the Promotional Rewards Points for Miles; (d) selling the Miles to third parties for cash; (e) cancelling the Points-Generating Purchases; and (f) maximizing profits by closing the Fraudulent Accounts before they accrued annual fees or other expenses.

### Manner and Means of the Conspiracy

4. It was part of the conspiracy that:

   a. LEV recruited individuals (the "Straw Cardholders") to provide him with their PII, which he used to open numerous Fraudulent Accounts with the Credit Card Company in the Straw Cardholders' names and on behalf of fictitious small businesses, in exchange for a flat fee to the Straw Cardholders for each Fraudulent Account opened. LEV made Points-Generating Purchases on the Fraudulent Accounts and sold the resulting Promotional Rewards Points to GIBSON and other third parties at a profit. LEV and his employees then canceled the Points-Generating Purchases before payment was due, and maximized their profits by closing the Fraudulent Accounts before annual or other fees could accrue. The Miles eventually were redeemed by third parties to purchase airfare.

   b. LEV and his employees used advertisements and referrals to recruit Straw Cardholders, who provided their PII in exchange for promised flat fees paid by LEV for credit cards obtained in the Straw Cardholders' names. LEV

and his employees concealed from the Straw Cardholders: (1) that their employment and income information would be falsified on the Applications; (2) that their PII would be used in conjunction with false information to open Fraudulent Accounts, sometimes as many as 99 per Straw Cardholder; and (3) that most of the purchases made with the Fraudulent Accounts would be cancelled rather than paid for.

    c.  LEV solicited bonus-rewards offers ("Rewards Offers") from the Credit Card Company in the names of nonexistent businesses (the "Straw Businesses"), using email addresses he falsely claimed were associated with the Straw Cardholders (the "Straw Email Addresses"), and using an address of a rented box at a UPS Store in New Jersey (the "Mail Drop").

    d.  LEV applied online for Fraudulent Accounts using the Straw Cardholders' PII and the Straw Email Addresses, along with fictitious small business, salary, and other information, and directed that the resulting credit cards be mailed to the Straw Cardholders' homes. The Credit Card Company would not have opened the Fraudulent Accounts absent the fraudulent representations made by LEV and his employees. When the credit cards arrived, LEV and his employees obtained the Fraudulent Account numbers from the Straw Cardholders in exchange for payments of the previously promised fees, which were paid from a bank account controlled by LEV.

    e.  LEV and his employees used the Fraudulent Accounts to make Points-Generating Purchases of, among other things, airline tickets and car rentals, with the intent to cancel the Points-Generating Purchases after

obtaining the resulting Promotional Rewards Points, converting them to Miles, and selling them.

  f. GIBSON used his business's merchant account with the Credit Card Company to charge Points-Generating Purchases to the Fraudulent Accounts, knowing that the Points-Generating Purchases would later be cancelled.

  g. GIBSON urged LEV to mix a small amount of "real" spending—*i.e.*, to use the Fraudulent Accounts to make, and ultimately pay the Credit Card Company for, legitimate purchases—to make it more difficult for the Credit Card Company to detect the fraudulent nature of the majority of Points-Generating Purchases. For example, on or about December 24, 2015, GIBSON emailed LEV: "[P]lease do some real spend so less issues. Talked to some other brokers, [the Credit Card Company] is pulling points from a lot of them that do [points] manufacturing, all blame fake spending." The same day, LEV responded: "[A]s long as we use points fast real spend is not [an] issue . . . ."

  h. LEV and his employees used various ruses to induce the Credit Card Company to expedite the posting of the Promotional Rewards Points to the Fraudulent Accounts before payment was due. For example, in one frequently used stratagem, a conspirator would call AmEx customer service, identify himself as a Straw Cardholder, and ask for pending Rewards Points to be vested before payment was due, so that he could use them to pay for upcoming honeymoon- or bereavement-related travel.

6

    i.  LEV and his employees took steps to conceal their identities as participants in the scheme, including by using pseudonyms in speaking with Straw Cardholders and by identifying themselves as particular Straw Cardholders in telephone calls with representatives of the Credit Card Company, with male conspirators occasionally mimicking female voices when impersonating female Straw Cardholders.

    j.  When Rewards Points were posted to a Straw Cardholder's account, LEV, GIBSON, and their employees converted the Rewards Points to Miles, often as soon as possible, by transferring them into Miles accounts controlled by LEV and GIBSON. To enable those transfers, LEV, GIBSON, and their employees added themselves to Straw Cardholders' accounts as "authorized users," without the Straw Cardholders' knowledge or consent.

    k.  LEV and his employees cancelled the Points-Generating Purchases, often soon after the Rewards Points had been converted to Miles.

    l.  LEV and his employees maximized their profits by closing the Fraudulent Accounts, often soon after converting the Rewards Points to Miles, to avoid incurring annual or other fees on the Fraudulent Accounts.

    m.  GIBSON paid LEV for the Miles generated by the scheme, in the form of wire transfers, Automated Clearing House ("ACH") payments, cash payments, and other means.

    n.  GIBSON sold the Miles to third parties for ultimate redemption as airfare.

    o. LEV opened more than 7,000 Fraudulent Accounts with the Credit Card Company, in the names of more than 1,500 Straw Cardholders, and obtained more than 790 million Rewards Points. The conspiracy caused the Credit Card Company to pay more than approximately $8.2 million to the airlines for accepting the Rewards Points in exchange for Miles.

  In violation of Title 18, United States Code, Section 1349.

## Counts Two and Three
### (Wire Fraud)

1. The allegations in paragraphs 1 and 4 of Count One of this Indictment are re-alleged and incorporated herein.

2. From in or about August 2014 through at least in or about May 2016, in Ocean County, in the District of New Jersey, and elsewhere, defendant

**AHARON LEV,**
**a/k/a "Aaron Lev,"**
**a/k/a "Aron Lev,"**
**a/k/a "David Gold,"**
**a/k/a "David Monroe"**

did knowingly and intentionally devise and intend to devise a scheme and artifice to defraud the Credit Card Company and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and, for purposes of executing and attempting to execute such scheme and artifice to defraud, did knowingly and intentionally transmit and cause to be transmitted by means of wire communications in interstate and foreign commerce certain writings, signs, signals, pictures, and sounds, as set forth below, each constituting a separate count of this Indictment:

| Count | Approximate Date | Description |
|---|---|---|
| Two | July 19, 2015 | LEV submitted and caused to be submitted account-closing instructions by wire transmission for a Fraudulent Account ending in 12400. |
| Three | July 19, 2015 | LEV submitted and caused to be submitted account-closing instructions by wire transmission for a Fraudulent Account ending in 42700. |

In violation of Title 18, United States Code, Sections 1343 and 2.

## Counts Four and Five
## (Aggravated Identity Theft)

1. The allegations in paragraphs 1 and 4 of Count One of this Indictment are re-alleged and incorporated herein.

2. On or about the dates specified below, in Ocean County, in the District of New Jersey, defendant

**AHARON LEV,
a/k/a "Aaron Lev,"
a/k/a "Aron Lev,"
a/k/a "David Gold,"
a/k/a "David Monroe"**

did knowingly and willfully transfer and cause to be transferred, without lawful authority, a means of identification of another person during and in relation to a felony violation enumerated in Title 18, United States Code, Section 1028A(c), to wit, wire fraud in violation of Title 18, United States Code, Chapter 63, Section 1343, knowing that the means of identification belonged to another actual person, as set forth below, each constituting a separate count of this Indictment:

| Count | Approximate Date | Description |
|---|---|---|
| Four | July 19, 2015 | LEV transferred the name of Victim 1 when submitting and causing to be submitted account-closing instructions for a Fraudulent Account ending in 12400. |
| Five | July 19, 2015 | LEV transferred the name of Victim 1 when submitting and causing to be submitted account-closing instructions for a Fraudulent Account ending in 42700. |

In violation of Title 18, United States Code, Sections 1028A(a)(i) and 2.

## FORFEITURE ALLEGATION

1.  As the result of committing the offense constituting specified unlawful activity as defined in Title 18, United States Code, Section 1956(c)(7), as alleged in Counts One through Three of this Indictment, the defendant(s) charged in each respective count shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of those offenses, and all property traceable thereto.

2.  If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

    (a) cannot be located upon the exercise of due diligence;

    (b) has been transferred or sold to, or deposited with, a third person;

    (c) has been placed beyond the jurisdiction of the Court;

    (d) has been substantially diminished in value; or

    (e) has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c),

to seek forfeiture of any other property of said defendants up to the value of the above forfeitable property.

A TRUE BILL

███████████████

FOREPERSON

*Craig Carpenito*
CRAIG CARPENITO
United States Attorney

CASE NUMBER: 20-

# United States District Court
# District of New Jersey

UNITED STATES OF AMERICA

v.

TIMOTHY GIBSON & AHARON LEV

## INDICTMENT FOR

18 U.S.C. §§ 1349, 1343, 1028A, 2

A True Bill,



Foreperson

CRAIG CARPENITO
UNITED STATES ATTORNEY
FOR THE DISTRICT OF NEW JERSEY

AUSA SARAH A. SULKOWSKI
ASSISTANT U.S. ATTORNEY
NEWARK, NEW JERSEY
(973) 297-2086